**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the Supreme Court of Georgia

Decided: December 20, 2022

S22A1109.  SMITH v. THE STATE.

ELLINGTON, Justice.

A Lamar County jury found Ronald Eugene Smith guilty of malice murder and other crimes in connection with the shooting death of Charles Adams.[1] Smith appeals from the denial of his

---

[1] On December 15, 2009, a Lamar County grand jury indicted Smith for malice murder (Count 1); felony murder predicated on aggravated assault (Count 2); aggravated assault (Count 3); possession of a firearm during the commission of a felony (Count 4); possession of a firearm by a convicted felon (Count 5); and tampering with evidence (Count 6). A bifurcated jury trial commenced on January 25, 2010. After the jury found Smith guilty of Counts 1-4 and 6 in the first part of the trial, the jury heard evidence on Count 5 and returned a guilty verdict. The trial court sentenced Smith to life in prison for murder; five years in prison for possession of a firearm during the commission of a felony, consecutive to Count 1; five years in prison for possession of a firearm by a convicted felon, consecutive to Count 4; and ten years in prison for tampering with evidence, consecutive to Count 5. The trial court purported to merge both the felony murder and aggravated assault counts into the malice murder conviction for sentencing purposes. Id. The felony murder count, however, did not merge with the malice murder count but was vacated by operation of law. See *Malcolm v. State*, 263 Ga. 369 (5) (434 SE2d 479) (1993).

Smith filed a timely motion for a new trial through trial counsel on February 26, 2010. That motion was amended by new counsel on May 17, 2021, and January 20, 2022. Following a hearing held on January 6, 2022, the trial court issued an order on Smith's amended motion for new trial on May 5, 2022.

motion for a new trial, contending that the evidence was insufficient to support the jury's verdicts, that the trial court erred in admitting Smith's custodial statements and in giving or refusing to give certain jury instructions, and that his trial counsel was ineffective. Because Smith's claims of error are without merit, we affirm.

1. Smith contends that the evidence supporting his conviction for malice murder was constitutionally insufficient.[2] He also argues that the evidence offered on the issue of his criminal intent to

---

The court denied all grounds for relief except Smith's contention that the sentence on Count 6, tampering with evidence, was incorrect. The trial court agreed and resentenced Smith to serve twelve months on probation to run concurrently with the malice murder conviction (Count 1). Smith filed a timely notice of appeal from the trial court's order. The appeal was docketed to the August 2022 term of this Court and submitted for a decision on the briefs.

[2] Although Smith claims he is challenging the sufficiency of the evidence supporting his "convictions," his argument pertains only to the sufficiency of the evidence supporting his conviction for malice murder. In *Davenport v. State,* 309 Ga. 385, 391-399 (4) (846 SE2d 83) (2020), we explained that this Court no longer will sua sponte consider evidence sufficiency in non-death penalty cases, starting with cases docketed to the term of Court that began in December 2020. Further, Supreme Court Rule 22 provides, in pertinent part, that "[a]ny enumerated error not supported by argument or citation of authority in the brief shall be deemed abandoned." Thus, Smith's unsupported claim of error pertaining to the sufficiency of the evidence of his remaining convictions is deemed abandoned. Id. See also *Davenport*, 309 Ga. at 391-399 (4); *Gay v. State*, 235 Ga. 240, 240 (1) (219 SE2d 156) (1975) (reviewing sufficiency of evidence as to murder conviction as argued, but deeming any argument as to other conviction abandoned).

2

commit murder was entirely circumstantial and did not rule out the reasonable hypothesis that the shooting was accidental, as Smith claimed in a statement to investigators. When reviewing the sufficiency of the evidence as a matter of constitutional due process, we view the evidence in the light most favorable to the verdicts, see *Jackson v. Virginia,* 443 U. S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979), and do not resolve conflicts in the evidence, leaving those within the province of the jury, see *Lowery v. State*, 310 Ga. 360, 362 (1) (a) (851 SE2d 538) (2020). Also, former OCGA § 24-4-6 provided: "To warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused."[3] "However, not every hypothesis is a reasonable one, and the evidence need not exclude every *conceivable* inference or hypothesis – only those that are reasonable." (Emphasis

---

[3] Smith was tried in 2010 under Georgia's former Evidence Code. Georgia's new Evidence Code applies to trials conducted after January 1, 2013. See Ga. L. 2011, p. 99, § 101. Former OCGA § 24-4-6 was carried forward into the new Evidence Code, and it now can be found at OCGA § 24-14-6.

in original.) *Merritt v. State*, 285 Ga. 778, 779 (1) (683 SE2d 855) (2009). Whether an alternative hypothesis raised by the defendant is "reasonable" is a question committed principally to the jury, "and where the jury is authorized to find that the evidence, though circumstantial, was sufficient to exclude every reasonable hypothesis save that of the guilt of the accused, we will not disturb that finding unless it is insupportable as a matter of law." (Citations omitted.) *Carter v. State*, 276 Ga. 322, 323 (577 SE2d 787) (2003). So viewed, the evidence presented at trial shows the following.

On the morning of January 30, 2009, LaTonya Harris and her two children walked out the front door of their duplex home in Barnesville, Lamar County. Harris, who lived next door to Adams, was about to drive her children to the school bus stop. As they stepped onto the left side of the front porch, Harris's son saw a plastic tube sliding across the right side of the porch toward Adams's front door. Harris testified that she heard a rustling noise near the ground on the right side of the duplex, the side where Adams lived. She saw a man crouched by the edge of the porch, pointing a rifle at

Adams's front door. Harris's son also saw the gunman. The gunman told Harris to "get [her] kids and go inside. This is a rifle." Harris and her children quickly retreated inside, hid, and called the police. Less than a minute after they went inside, Harris and her children heard a gunshot. Harris and her son later identified Smith as the gunman.

When the police arrived at the duplex, they found Adams lying across the threshold of his front doorway in a pool of his blood, dead. Though his upper body fell outside onto the porch, his feet and ankles were inside the house. The police immediately interviewed Adams's neighbors. Smith, who lived across the street from Adams, was one of the people who spoke to the police. He told an officer that his friend Mickey told him that the shooting was a suicide.

The police searched the area around the duplex with a K9 unit to determine the path the gunman took to and from the duplex. Police dogs following the gunman's scent led officers around the right side of the duplex into the backyard, then through some bushes and into a bare area in the woods behind the duplex. The path then

wound back to the edge of the street, ending at Smith's home. Along the path, the police found pieces of a silver buckle. The police later matched the buckle pieces to a pair of red suspenders (which were missing a buckle) recovered during a consent search of Smith's home. The police later obtained a warrant for a more expansive search of the home and surrounding grounds. Investigators found spent shell casings for a 30-06 rifle near Smith's driveway. The police recovered a Remington 30-06 rifle from the creek behind Smith's house. They also found a pair of wet shoes in Smith's basement that they later matched to shoe prints found in the sand by the creek. The rifle's open carrying case was found near a ditch in Smith's front yard.

On January 30, 2009, the police arrested Smith pursuant to a bench warrant on an unrelated misdemeanor charge. While in custody, Smith signed a waiver of rights form and agreed to answer questions about Adams's death. Smith denied any involvement in the shooting. The next day, Smith filled out a form requesting to speak with law enforcement. After signing a second waiver of rights

6

form, Smith admitted walking up to the duplex from the right side, standing on the ground by the front porch of the duplex, sliding a plastic tube across the porch to strike Adams's front door, seeing and speaking to Harris and her children, pulling the trigger and shooting Adams, and hiding the rifle in the creek. Smith also admitted that the shoes he wore the morning of the shooting were his wife's, and that he told his wife to tell the police that any footprints found in the yard were hers. Smith claimed, however, that the shooting was accidental. He said that, after Harris took her children inside, Adams walked out onto the porch to talk with him about buying the rifle he was carrying. Smith, a former Marine sniper, repeatedly asserted that the rifle discharged while he was showing Adams how to use it. Smith said that he removed the rifle's magazine, pulled the rifle bolt back, and then, believing the rifle was unloaded, pressed the trigger.

In his custodial statements,[4] Smith explained that he wanted

---

[4] It is unclear from the record exactly which portions of Smith's recorded statements were played at trial for the jury. However, the record reflects that the jury was allowed to review the transcripts of both statements.

to get rid of the rifle and was in the process of removing contraband from his house (including drugs, needles, and drug paraphernalia) because he was afraid that Mickey, a man who often stayed with Adams, planned to "call the police on him." Smith admitted that he had served three years in prison for a drug conviction and should not have had a rifle in his possession. Smith thought Mickey might report him to the police because Smith owed Mickey money for drugs that Mickey had "fronted" to him but for which he refused to pay because the drugs were "no good." At trial, the State argued based on this evidence that Smith intended to kill Mickey but shot Adams instead.

A firearms expert was able to match the bullet that killed Adams with the Remington 30-06 rifle recovered from the creek, where Smith admitted hiding it. The expert also determined that two shell casings found on the ground outside Adams's home were fired from the same Remington 30-06 rifle used to shoot Adams. The firearms expert explained that the rifle, which was functioning properly, would not have accidentally discharged in the manner

8

Smith described during his custodial interview. According to the expert, it is impossible to pull the bolt back and have it stay back without the magazine attached. Further, pulling the bolt back, as Smith claims he did, would have ejected the round in the chamber. The only way to make the rifle fire is to pull the trigger while a loaded magazine is attached.

The medical examiner testified that Adams suffered severe brain trauma as a result of the shooting and died instantly. The autopsy revealed significant skull fracturing consistent with a high-velocity bullet fired from a rifle. The medical examiner testified that the bullet that killed Adams was fired from at least two feet away. The bullet entered Adams's right cheek and exited the left side of his head. The trajectory of the bullet was slightly upward, consistent with the rifle being fired from an area lower than the entry wound on the victim's head. Based on his review of the evidence, including investigators' descriptions of the location and position of the body, the medical examiner testified that Adams was standing in the doorway of his home, not out on the porch, when he was shot. Adams

would have fallen immediately and would not have been able to move at all following the shooting.

The evidence presented at trial was sufficient to allow a rational jury to find beyond a reasonable doubt that Smith was guilty of malice murder. Moreover, the evidence, including expert testimony that the rifle could not have been fired in the way Smith claimed, was sufficient under OCGA § 24-14-6 to authorize a jury to reject as unreasonable Smith's hypothesis that the shooting was accidental and, instead, to find that he intentionally and with malice aforethought shot and killed Adams. See, e.g., *Yeager v. State*, 281 Ga 1, 2 (1) (635 SE2d 704) (2006) (The evidence was sufficient as a matter of constitutional due process to reject the defendant's accident defense and to convict her of malice murder; the jury could have inferred that the shooting was intentional based on expert testimony rebutting the claim that the weapon discharged accidentally.) (decided under former OCGA § 24-4-6). See also *Jones v. State*, 314 Ga. 400, 405-407 (2) (877 SE2d 232) (2022) (accord).

2. Smith contends the trial court erred in admitting evidence

10

of his custodial interviews because his statements were the product of an illegal detention and violated his rights under the Fourth Amendment to the United States Constitution. Smith argues that he was illegally detained after he posted bond following his arrest on a misdemeanor charge unrelated to Adams's murder. The record and trial transcript show that Smith did not challenge the lawfulness of his arrest or of his continued detention during his *Jackson-Denno*[5] hearing or at trial. Instead, he raised it for the first time in his motion for a new trial. Because this challenge to the admissibility of Smith's statements was not timely made, it is waived for purposes of appellate review.[6] See, e.g., *Davis v. State*, 255 Ga. 588, 591 (1) (a) (340 SE2d 862) (1986) ("We decline to address alleged deficiencies in the state's showing of probable cause

---

[5] See *Jackson v. Denno*, 378 U. S. 368 (84 SCt 1774, 12 LE2d 908) (1964).

[6] Under the former Evidence Code, to preserve for appellate review a claim that the trial court improperly admitted or excluded evidence under a particular theory, a defendant was required to argue at trial that the evidence should be admitted or excluded under that particular theory. See, e.g., *Cross v. State*, 309 Ga. 705, 709 (2) (848 SE2d 455) (2020); *Brown v. State*, 295 Ga. 804, 814 (764 SE2d 376) (2014). Compare OCGA § 24-1-103 (d) (providing for plain error review of unpreserved evidentiary objections under the current Evidence Code).

11

to arrest when the state could not reasonably have been aware that it was necessary to establish probable cause, and when the state might well have decided to make a more complete evidential presentation if it had been aware that a Fourth Amendment issue was being raised."); *Williams v. State*, 270 Ga. App. 480, 481-482 (606 SE2d 671) (2004) (A defendant who does not timely assert a Fourth Amendment objection to the admissibility of his statements to police waives this issue for purposes of appeal.).

3. Smith contends the trial court erred in denying his written request for a jury instruction on involuntary manslaughter. Smith's requested involuntary manslaughter instruction was predicated on Smith having allegedly committed the misdemeanor offenses of discharging a firearm while under the influence of drugs or alcohol, OCGA § 16-11-134,[7] and discharging a firearm on the property of

---

[7] OCGA § 16-11-134 provides, in pertinent part:
        (a) It shall be unlawful for any person to discharge a firearm while:
        (1) Under the influence of alcohol or any drug or any combination of alcohol and any drug to the extent that it is unsafe for the person to discharge such firearm except in the defense of

another, OCGA § 16-11-104.[8] The trial court denied the request, noting that the defense failed to present slight evidence warranting a charge on involuntary manslaughter. Defense counsel did not object to the trial court's ruling or express any exceptions to the final charge. Consequently, as Smith concedes, this claim of instructional error may be reviewed for plain error only.[9] See OCGA § 17-8-58 (b); *Blackwell v. State,* 302 Ga. 820, 822 (2) (809 SE2d 727) (2018). Review for plain error means that we will reverse the trial court

---

life, health, and property;

    (2) The person's alcohol concentration is 0.08 grams or more at any time while discharging such firearm or within three hours after such discharge of such firearm from alcohol consumed before such discharge ended; or

    (3) Subject to the provisions of subsection (b) of this Code section, there is any amount of marijuana or a controlled substance, as defined in Code Section 16-13-21, present in the person's blood or urine, or both, including the metabolites and derivatives of each or both without regard to whether or not any alcohol is present in the person's breath or blood.

[8] OCGA § 16-11-104  provides, in pertinent part:

    (a) It shall be unlawful for any person to fire or discharge a firearm on the property of another person, firm, or corporation without having first obtained permission from the owner or lessee of the property.

[9] Although this case was tried in 2010 under the former Evidence Code, plain error review of claims of instructional error began in 2007 with the enactment of OCGA § 17-8-58. See Ga. L. 2007, p. 597, § 5 ("This Act . . . shall apply to all trials which occur on or after July 1, 2007.").

"only if there was an instructional error that was not affirmatively waived, was obvious beyond reasonable dispute, likely affected the outcome of the proceedings, and seriously affected the fairness, integrity, or public reputation of judicial proceedings." (Citation and punctuation omitted.) *Blackwell*, 302 Ga. at 823 (2). Smith has "the burden of showing a clear or obvious error and further making an affirmative showing that the error probably did affect the outcome below." Id. See also *Palencia v. State*, 313 Ga. 625, 627 (872 SE2d 681) (2022).

> "Involuntary manslaughter" is defined in OCGA § 16-5-3 (a) as "caus[ing] the death of another human being without any intention to do so by the commission of an unlawful act *other than a felony*." (Emphasis supplied.) "[A] charge on involuntary manslaughter should be given, upon a proper request, when there is slight evidence to support it." *Cash v. State*, 297 Ga. 859, 863-864 (778 SE2d 785) (2015) (citation and punctuation omitted). Conversely, where evidence presented at trial shows "the commission of [a] completed offense . . . or the commission of no offense, the trial court is not required to charge the jury on a lesser included offense." Id. at 864 (citation and punctuation omitted).

*Moon v. State*, 311 Ga. 421, 424 (2) (858 SE2d 18) (2021).

The trial court did not err in denying the requested instruction

14

under these circumstances. Pretermitting whether slight evidence existed supporting Smith's argument that he was committing either of the alleged predicate misdemeanor offenses, the evidence shows that Smith was a convicted felon when he shot Adams.[10] Therefore, the evidence shows he was committing a felony by simply holding the rifle in his hand. See OCGA § 16-11-131 (b) (felon in possession of a gun is a felony offense). "And that felony precluded any instruction on involuntary manslaughter as a matter of law." *Moon*, 311 Ga. at 424 (2). See also *Finley v. State*, 286 Ga. 47, 49-50 (685 SE2d 258) (2009) (holding that the trial court did not err when it denied the defendant's requested involuntary manslaughter jury instruction because the evidence at trial "did not reflect that the killing resulted from an act other than a felony, given [the defendant's] status as a convicted felon and his admission that he possessed a gun, however briefly"). Given that the evidence shows

---

[10] In addition to Smith's statements concerning his prior drug conviction, the record shows that the State submitted a certified copy of Smith's 2007 felony conviction for possession of methamphetamine in the second portion of the bifurcated trial.

15

that Smith was a convicted felon in possession of a rifle when he admittedly shot Adams, the trial court did not err, let alone plainly err, by refusing to instruct the jury on involuntary manslaughter. See *Moon*, 311 Ga. at 424 (2).

4. Smith contends the trial court erred in instructing the jury on transferred intent. The trial court gave the following jury charge: "If one intentionally commits an unlawful act, yet the act harmed a victim other than the one intended, it is not a defense that the defendant did not intend to harm the actual person injured." Again, Smith concedes that, because he did not object to the trial court's ruling, this claim of error may be reviewed for plain error only. See OCGA § 17-8-58 (b); *Blackwell,* 302 Ga. at 822 (2).

> Under the doctrine of transferred intent, when an unintended victim is struck down as a result of an unlawful act actually directed against someone else, the law prevents the actor from taking advantage of his own wrong and transfers the original intent from the one against whom it was directed to the one who actually suffered from it.

(Citation omitted.) *Boatright v. State*, 289 Ga. 597, 601 (713 SE2d 829) (2011). Smith argues that the trial court committed plain error

16

in charging the jury on transferred intent because the State failed to present any evidence that Smith intended to shoot anyone. We disagree.

The State presented evidence that Smith bought drugs from a person named Mickey who sometimes stayed at Adams's home. Smith admitted that he owed Mickey money for drugs but was not planning to pay him because the drugs were of poor quality. Smith also feared that Mickey was going to report him to the police, which was why Smith claimed he was trying to sell Adams the rifle. This evidence supports the State's theory that Smith had a motive to shoot Mickey and likely intended to, particularly when the evidence showed that Adams was shot almost immediately upon opening his front door – evidence from which the jury could infer that Smith may not have had time to identify who opened the door. Because there was at least slight evidence to support giving the charge, there is no error and, therefore, no plain error. See *Baptiste*, 288 Ga. at 658 (4) ("A trial court is authorized to give a requested jury instruction if there was produced at trial slight evidence supporting the theory of

17

the jury charge.") (citation omitted).

5. Smith contends his trial counsel was constitutionally ineffective. To prevail on his claim of ineffective assistance of trial counsel, Smith must prove both that counsel's performance was professionally deficient and that he was prejudiced by the deficient performance. See *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984); *Terry v. State*, 284 Ga. 119, 120 (2) (663 SE2d 704) (2008). To prove deficient performance, Smith must show that his counsel performed in an "objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." *Romer v. State*, 293 Ga. 339, 344 (3) (745 SE2d 637) (2013). "[R]easonable trial strategy and tactics do not amount to ineffective assistance of counsel." *Johnson v. State*, 286 Ga. 787, 791 (2) (692 SE2d 575) (2010). To prove prejudice, Smith "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466

18

U. S. at 694 (III) (B). "This burden is a heavy one." *Young v. State*, 305 Ga. 92, 97 (5) (823 SE2d 774) (2019). And if Smith fails to show either deficiency or prejudice, this Court need not examine the other prong of the *Strickland* test. See *Palmer v. State*, 303 Ga. 810, 816 (IV) (814 SE2d 718) (2018).

Smith contends that trial counsel's performance was deficient in the following four respects.

(a) Smith contends that his trial counsel should have objected when the investigator who interviewed Smith gave the following trial testimony: "If he's going to admit he's there, he pulls the trigger, that's fine with me. Do I believe it's an accident? No, I do not." Smith contends the officer's statement invaded the province of the jury, which was to decide an ultimate issue in the case, that is, whether the shooting was accidental.

Under our former Evidence Code, it was settled that "a witness ordinarily may not express his opinion as to an ultimate fact, because to do so would invade the province of the jury." (Citation and punctuation omitted.) *Pyatt v. State*, 298 Ga. 742, 755 (6) (b)

19

(784 SE2d 759) (2016). For purposes of this appeal, we assume, without deciding, that the testimony at issue was objectionable on "ultimate issue" grounds. We also assume, again, without deciding, that the failure to raise such an objection was unreasonable. Even so, Smith still must show that the failure to object was prejudicial. See id. We conclude that Smith has failed to make that showing.

Although it may have been improper for the investigator to share her subjective belief that the shooting was not accidental, any rational juror would have surmised that she believed as much. As we have explained before, "[s]uch comments upon the patently obvious generally pose little, if any, danger of prejudice." *Butler v. State*, 292 Ga. 400, 407 (3) (a) (738 SE2d 74) (2013). Also, the investigator's comment was brief and made in the context of explaining her investigatory technique of pretending to believe Smith's account of events in order to encourage him to keep talking. The record shows that the investigator did not elaborate on why she thought the shooting was not accidental, and the prosecutor moved

on to another line of questioning.[11] The record does not reflect that the prosecutor made any improper use of the investigator's testimony. In this brief exchange, there was little, if any, danger of prejudice. See *Pyatt*, at 757. Further, if Smith's lawyer had objected, the trial court might well have sustained the objection and responded with curative instructions, charging the jury that determining guilt, assessing the credibility of the evidence, resolving

---

[11] The record shows that the prosecutor did not ask the investigator to give her opinion about whether the shooting was accidental. Rather, the prosecutor asked the investigator to explain why she told Smith that she believed his account of the shooting.

> PROSECUTOR: Several times during the interview, both you, yourself, and [another investigator] talk about basically ["]I believe you, I understand,["] things such as that. I know that might be a little confusing to the jury. Can you tell them, is that something you commonly do in interviews? Does that necessarily mean you do believe what the person is telling you?

> INVESTIGATOR: No, sir. It doesn't mean that I believe him. He came to us and wanted to talk to us, so we're not going to tell him okay. If he's going to tell me that's it's an accident and he's going to say ["]I was at the scene.["] He places himself at the scene, he admits he's crouched down by the banister, which is consistent with the witnesses. He admits that he pulled the trigger. His story is consistent. I'm not going to stop him. He's talking. ["]Okay. Yes, sir. We understand you.["] He's telling us all that. It's kind of like baby steps. If he's going to admit he's there, he pulls the trigger, that's fine with me. But do I believe it's an accident, no, I do not.

> PROSECUTOR: But, at this point, what you're trying to do is gather as much evidence as possible.

conflicts in the evidence, and weighing the evidence are tasks solely for the jury. The record shows that the trial court gave those sorts of instructions at the close of the case, essentially addressing any claim of prejudice that would have been raised in an objection but without drawing undue attention to the investigator's statement.

Given the facts of this case, we conclude that Smith has failed to show a reasonable probability that, if only his lawyer had objected to the investigator's statement on direct examination that she did not believe the shooting was accidental, the outcome of the case would have been different. Consequently, Smith has failed to show that he was prejudiced by the allegedly deficient performance of his lawyer.

(b) Smith contends that his trial counsel should have objected to or requested redactions of statements the investigator made to Smith during the custodial interview concerning the "ultimate issue" of whether the shooting was accidental. During her interview, the investigator told Smith: "What I'm saying is the gun didn't just accidentally go off. You understand what I'm saying." Trial counsel

was not deficient for failing to have this statement redacted from the recorded interview. The statement was not an opinion on an ultimate issue; it was a comment designed to prompt Smith into defending his account of how the shooting occurred.

> As we have explained before, law enforcement interrogations are, by their very nature, attempts to determine the ultimate issue and the credibility of witnesses. Comments made in such an interview and designed to elicit a response from a suspect do not amount to opinion testimony, even when testimony reflecting the comments is admitted at trial.

(Citations and omitted.) *Butler v. State*, 292 Ga. 400, 405 (738 SE2d 74) (2013). As such, an ultimate-issue objection to statements the investigator made during the custodial interview would have been meritless, and the failure to make a meritless objection is not deficient performance. See *Stafford v. State*, 312 Ga. 811, 819-820 (865 SE2d 116) (2021).

(c) Smith contends that trial counsel was deficient for failing to object to the jury instruction on transferred intent, arguing that the State presented no evidence that Smith intended to shoot anyone. As explained in Division 4, the trial court did not err in

giving the charge because it was adjusted to the evidence supporting the State's theory that Smith intended to shoot Mickey. Because there was at least slight evidence to support the State's theory of transferred intent, an objection raised on these grounds would have been without merit, and the failure to make a meritless objection is not deficient performance. See *Stafford*, 312 Ga. at 819-820.

(d) Smith contends that trial counsel was deficient for failing to object to or to request redactions of Smith's statements concerning "prior difficulties" between himself and Mickey. In his custodial interview, Smith told investigators that he was concerned that Mickey was going to "call the cops" on him and get him in trouble. Consequently, Smith felt the need to remove drug and firearm contraband from his house, which is why he went to see whether Adams would buy the rifle. Smith contends that the trial court would have excluded this evidence had counsel objected because the State failed to provide the required notice of its intent to use evidence of "prior difficulties" and the trial court had not held a hearing to determine the evidence's admissibility.

24

In 2010, before a trial court could admit any evidence of a prior difficulty into evidence, the State was required to give timely notice to the defendant or have the untimeliness excused by the court. See *Ragan v. State*, 264 Ga. 190, 192 (442 SE2d 750) (1994). In addition, before such evidence could be admitted, the trial court was required to make certain on-the-record findings required by this Court. See *Williams v. State*, 261 Ga. 640, 641-642 (2) (409 SE2d 649) (1991). However, an exception existed where evidence of other criminal transactions was a part of the "res gestae." See, e.g. *Fulton v. State*, 278 Ga. 58, 60, (597 SE2d 396) (2004) ("The trial court admitted the testimony as res gestae evidence, which is not subject to the notice and hearing requirements of USCR 31.1. USCR 31.3 (E).").[12]

The statements Smith made during his custodial interview

---

[12] Our current Evidence Code limits the admission of evidence of other criminal acts, see OCGA § 24-4-404 (b), but those limitations do not apply to "intrinsic evidence." *Smith v. State*, 302 Ga. 717, 725 (4) (808 SE2d 661) (2017) (citation and punctuation omitted). "Intrinsic evidence" is defined as evidence that (1) pertains to an uncharged offense arising from the same transaction or series of transactions as the charged offense; (2) is necessary to complete the story of the crime; or (3) is inextricably intertwined with the evidence regarding the charged offense. See *Harris v. State*, 310 Ga. 372, 377 (2) (b) (850 SE2d 77) (2020).

concerning his difficulties with Mickey constituted relevant, res gestae evidence. Under the former rules of evidence that apply here,

> the State is entitled to present evidence of the entire res gestae of the crime. Even though a defendant is not charged with every crime committed during or near the time of a criminal transaction, every aspect of it relevant to the crime charged may be presented at trial. This is true even if the defendant's character is incidentally placed in issue. A statement of an eyewitness as to what occurred shortly before or shortly after the commission of the murder, even if it shows the commission of an additional uncharged crime, generally was admissible under those rules as relevant res gestae evidence.

(Citations and punctuation omitted.) *Johnson v. State*, 292 Ga. 785, 789 (4) (741 SE2d 627) (2013).

In this case, the State argued that Smith shot Adams in the mistaken belief that Adams was Mickey. In his custodial statements, Smith admitted that he owed Mickey money, that he believed Mickey intended to report him to the police, and that he was removing contraband from his home to avoid getting in trouble. This evidence was relevant to show Smith's motive for shooting Adams (whom he believed was Mickey), as well as the chain of events leading up to the shooting. Those events occurred near in

time and were related to the charged crimes. As such, the evidence was admissible as part of the res gestae. See *Johnson*, 292 Ga. at 789 (4) (defendant's alleged involvement in a marijuana transaction was admissible res gestae evidence explaining his presence at the scene of the crime and to show his motive and state of mind). Therefore, trial counsel's "prior difficulties" objection would have been meritless. Deficient performance cannot be based on an objection that would have been meritless. See *Stafford*, 312 Ga. at 819-820.

Because Smith has failed to carry his burden of demonstrating that he was denied the effective assistance of counsel, he is not entitled to a new trial on that ground.

*Judgment affirmed. All the Justices concur.*